IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

UNITED STATES OF AMERICA,

v.

GEORGE DRUMMOND,

*Defendant.*

Criminal Action No. ELH-19-286

**MEMORANDUM OPINION**

Defendant George Drummond entered a plea of guilty in April 2021 to the offenses of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846, and possession with intent to distribute controlled substances, in violation of 21 U.S.C. §841(a)(1). *See* ECF 1048; ECF 1051. On July 14, 2021, the Court sentenced defendant to a total term of 48 months of imprisonment. ECF 1198 (Judgment).

Drummond, who is now self-represented, has filed a motion for compassionate release (ECF 1372, the "Motion"), in which he seeks appointment of counsel. *Id.* at 2, 16. The Motion is supported by several exhibits, docketed collectively at ECF 1372-1. *Id.* at 1 (Exhibit A); *id.* at 2 (Exhibit B); *id.* at 3 (Exhibit C); *id.* at 4-7 (Exhibit D). The government opposes the Motion (ECF 1397, the "Opposition"), supported by two exhibits. ECF 1397-1; ECF 1397-2. Drummond replied. ECF 1414 (the "Reply"). Defendant has also submitted supplemental correspondence. ECF 1402; ECF 1403.

The Federal Public Defender has declined to represent Drummond in this matter. ECF 1377.

No hearing is necessary to resolve the Motion. *See* Local Rule 105.6. For the reasons that follow, I shall deny the Motion.

## I. Background

Drummond was indicted on June 11, 2019 (ECF 23), along with eighteen others. A Superseding Indictment was filed on March 22, 2018, which added six additional defendants. ECF 96. A Second Superseding Indictment was filed on April 21, 2021. ECF 1031.

Thereafter, defendant was charged in a two-count Superseding Information with conspiracy to distribute and possess with intent to distribute controlled substances, in violation of 21 U.S.C. §846 (Count One), and possession with intent to distribute controlled substances, in violation of 21 U.S.C. §841(a)(1) (Count Two). ECF 1048. Pursuant to a Plea Agreement (ECF 1054), on April 28, 2021, Drummond entered a plea of guilty to both counts of the Superseding Information. ECF 1051.

In the Plea Agreement, the parties stipulated to the following facts, ECF 1054 at 10-11:

> Beginning no later than July 2018, the defendant, George Drummond ("Drummond") engaged in a conspiracy to distribute controlled substances, including fentanyl, heroin, cocaine, and cocaine base in Baltimore City, Maryland. The defendant agreed with various coconspirators to acquire these controlled substances and to assist in distributing those controlled substances to other persons.

> In or about July of 2018, Drug Enforcement Administration ("DEA"), Strike Force Group 1 ("SF1") began an investigation of the Monument Street corridor in east Baltimore. Law enforcement knows this area supports a high-volume of street-level drug distribution and attendant acts of violence associated with the drug trafficking. As part of the investigation, the DEA obtained authority to intercept the wire and electronic communications of several individuals from that area. Additionally, investigators conducted controlled purchases of narcotics in the area utilizing confidential informants and undercover Baltimore City Police ("BPD") officers. These undercover purchases identified multiple street-level drug trafficking "shops" and identified the drugs shops' sources of supply of narcotics.

> During the investigation, investigators identified Tony Solomon as a source of supply, and Drummond as his associate. Drummond was responsible for packaging controlled dangerous substances as well as maintaining a stash location of controlled dangerous substances for members of the conspiracy, to include cocaine. Drummond participated in the conspiracy and knew that members of the conspiracy distributed narcotics in and around the Baltimore area. Throughout the course of his involvement, it was reasonably foreseeable to Drummond, and within

the scope of the conspiracy that he or other members of the conspiracy would distribute at least 3.5 kilograms but less than 5 kilograms of cocaine (a Schedule II controlled substance), as well as quantities of fentanyl and heroin, during the course of and in furtherance of the conspiracy.

Drummond participated in the activities of the conspiracy in the District of Maryland. Some examples of Drummond's participation in the conspiracy include, but are not limited to:

- Drummond maintained a stash location at his residence located at 3201 Brighton Street, Baltimore, Maryland. Drummond, along with co-conspirators would use this location for storing, cutting and packaging controlled dangerous substances with other members of the conspiracy. Based on intercepted communications with coconspirators, investigators believe this stash location was also used to meet with customers and conduct drug trafficking activities.

- Additionally, on behalf of Solomon, Drummond would deliver cocaine to a coconspirator to "cook" the cocaine. From approximately July 2018 to January 2019, Drummond delivered cocaine every two weeks, totally [sic] approximately 6 kilograms over the course of the conspiracy. The defendant admits that he possessed the cocaine with the intent to distribute them for sale.

- On January 23, 2019, investigators executed a search and seizure warrant at 3201 Brighton Street, Baltimore, Maryland, and investigators recovered controlled dangerous substances and a firearm. Drummond, along with co-conspirators possessed with intent to distribute approximately 147 grams of a mixture containing heroin and fentanyl, one large kilo press and one small kilo press (used for packaging controlled substances) containing cocaine, heroin and fentanyl, cutting agents and multiple bags of gelatin capsules. The defendant admits that he possessed the cocaine with the intent to distribute them for sale.

Pursuant to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G."), the Plea Agreement anticipated an adjusted base offense level of 26, before deductions for acceptance of responsibility. ECF 1054, ¶¶ 6(c), (d). But, according to the Presentence Report ("PSR", ECF 1175) Drummond's base offense level was 30. *Id.* ¶ 20. And, the PSR added two levels pursuant to U.S.S.G. §2D1.1(b)(12), because Drummond "maintained a premises for the purpose of manufacturing or distributing a controlled substance." *Id.* ¶ 21. In sum, whereas the Plea

Agreement anticipated a final offense level of 23, ECF 1054, ¶ 6(d), the PSR called for a final offense level of 29, after deductions for acceptance of responsibility. ECF 1175, ¶¶ 27, 28, 29.

The Plea Agreement also anticipated a criminal history score of 3 and a criminal history category of II.  ECF 1054, ¶ 6(a). The Presentence Report was consistent with the Plea Agreement. *See* ECF 1175, ¶ 42.

Sentencing was held on July 14, 2021.  ECF 1196.  At that time, Drummond was fifty-one years of age.  *See* ECF 1175 at 3. With a final offense level of 29 and a criminal history category of II, the Guidelines called for a period of imprisonment ranging from 97 months to 121 months of imprisonment. *Id*. at 22.

The PSR reflected that Drummond used heroin, cocaine, and marijuana from 1998 until his arrest in 2003. *Id.* ¶ 63. After Drummond's release from prison in 2008, he did not use drugs until 2018, when "he started using marijuana to manage his chronic pain." *Id.*[1]

I imposed a sentence of 48 months' imprisonment, to be followed by four years' supervised release. ECF 1198.

Drummond moved on several occasions to delay his surrender, due to his need for lumbar surgery and his need to recover. And, the Court granted those motions.  *See* ECF 1287 to ECF 1364. In total, Drummond's date of surrender was postponed from the original date of October 14, 2021, to September 12, 2022. *Id; see also* ECF 1372 at 2-3.

---

[1] I note that the PSR indicates: "According to a report prepared June 27, 2019, the defendant does not have a substance abuse issue and is not in need of treatment." ECF 1175, ¶ 64. However, as discussed, *infra*, as of November 2022, Drummond's medical records clearly indicate that he suffers from two substance abuse disorders. *See* ECF 1397-2 at 66.

Furthermore the PSR indicates that Drummond has never participated in a drug program. ECF 1175, ¶ 64. However, as discussed, *infra,* Drummond avers that he is enrolled in the Residential Drug Abuse Program. ECF 1414 at 5.

Drummond is currently serving his sentence at Lewisburg USP. *Find an inmate*, FEDERAL BUREAU OF PRISONS, https://www.bop.gov/inmateloc/ (last visited May 5, 2023).  He has served about eight months of his 48-month sentence, or approximately 17% of his sentence.  The Bureau of Prisons ("BOP") indicates that he has a projected release date of December 3, 2025.

On September 19, 2022, Drummond filed a request for an administrative remedy with the Warden of USP Lewisburg.  ECF 1371-1 at 2.  The Warden denied Drummond's request on September 27, 2022. *Id.* at 3. On January 30, 2023, Drummond filed a second request for administrative remedy, seeking home confinement. ECF 1403. The request was initially granted, in part, pending approval by the "review committee." ECF 1402-1. However, the Court has been informed that Drummond's second request for an administrative remedy was denied.

The Motion was filed on November 4, 2022. ECF 1372. Drummond notes that, in light of the COVID-19 pandemic, his "morbid medical conditions" constitute an extraordinary and compelling reason justifying compassionate release. *Id.* at 6. He also claims that his age and rehabilitation weigh in favor of release. *Id.* at 14. In the Motion, defendant seeks a sentence reduction from 48 months' imprisonment to time served or, in the alternative, he asks for "home detention." *Id.* at 1.

The government seems to acknowledge that Drummond's medical condition establishes "the minimum threshold showing for compassionate release."  ECF 1397 at 21. But, it argues that his condition does not warrant release as his "medical complaints are being treated." *Id.*  And, the government contends that by virtue of Drummond having received the COVID-19 vaccination, he has "provided effective 'self-care' against the virus, and does not present any extraordinary and compelling reason allowing compassionate release." *Id.* at 23. Moreover, the government contends

that early release is not warranted due to Drummond's extensive criminal history and the seriousness of the instant offense. ECF 1397 at 29.

Additional facts are discussed, *infra*.

## II. Appointment of Counsel

Drummond asks the Court to appoint counsel for him. ECF 1372 at 16. But, there is no constitutional right to appointed counsel in this proceeding. *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987) ("The right to appointed counsel extends to the first appeal of right, and no further."). Rather, the determination to appoint counsel rests solely within the discretion of the district court. *See United States v. Legree*, 205 F.3d 724, 730 (4th Cir. 2000) (explaining that a district court has the discretion to appoint defendant counsel under 18 U.S.C. § 3582(c) in exceptional circumstances).

Drummond has ably demonstrated the ability to articulate the legal and factual basis of his claims. And, a review of defendant's case does not reveal any unusual or exceptional circumstances that would warrant the appointment of counsel.

Therefore, I shall deny defendant's request for counsel, without prejudice.

## III. Standard of Review

Ordinarily, a court "may not modify a term of imprisonment once it has been imposed." 18 U.S.C. § 3582(c); *see United States v. Malone*, 57 F.4th 167, 173 (4th Cir. 2023); *United States v. Bond*, 56 F. 4th 381, 383 (4th Cir. 2023); *United States v. Bethea*, 54 F.4th 826, 831 (4th Cir. 2022); *United States v. Ferguson,* 55 F.4th 262, 267 (4th Cir. 2022); *United States v. Hargrove*, 30 F.4th 189, 194 (4th Cir. 2022); *United States v. Chambers*, 956 F.3d 667, 671 (4th Cir. 2020); *United States v. Jackson,* 952 F.3d 492, 495 (4th Cir. 2020); *United States v. Martin*, 916 F.3d 389, 395 (4th Cir. 2019). But, "the rule of finality is subject to a few narrow exceptions." *Freeman*

6

*v. United States*, 564 U.S. 522, 526 (2011).   One such exception is when the modification is "expressly permitted by statute."   18 U.S.C. § 3582(c)(1)(B); *see Jackson*, 952 F.3d at 495.

Congress "broadened" the authority of the courts in 2018, with passage of the First Step Act ("FSA"), Pub. L. No. 115-391, 132 Stat. 5194, 5239 (2018) (codified as 18 U.S.C. § 3582(c)(1)(A)).   *Malone*, 57 F.4th at 173.   Commonly termed the "compassionate release" provision, 18 U.S.C. § 3582(c)(1)(A)(i) provides a statutory vehicle to modify a defendant's sentence if "extraordinary and compelling reasons warrant such a reduction."   *Hargrove*, 30 F.4th at 194.   This provision is an exception to the ordinary rule of finality in regard to a federal sentence. *United States v. Jenkins*, 22 F.4th 162, 169 (4th Cir. 2021).

Section 3582 was first enacted as part of the Sentencing Reform Act of 1984.   Originally, it permitted a court to alter a sentence only upon a motion by the Director of the BOP.   *See* Pub. L. No. 98-473, § 224(a), 98 Stat. 2030 (1984).   Thus, a defendant seeking compassionate release had to rely on the BOP Director for relief.   *See Bethea*, 54 F.4th at 831; *see, e.g.*, *Orlansky v. FCI Miami Warden*, 754 F. App'x 862, 866-67 (11th Cir. 2018); *Jarvis v. Stansberry*, No. 2:08CV230, 2008 WL 5337908, at *1 (E.D. Va. Dec. 18, 2008) (denying compassionate release motion because § 3582 "vests absolute discretion" in the BOP).

For many years, the safety valve of § 3582 languished.   The BOP rarely filed motions on an inmate's behalf.   As a result, compassionate release was exceedingly rare.   *See Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* 66 (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice) (observing that, on average, only 24 inmates were granted compassionate release per year between 1984 and 2013).

As a result of the enactment of the FSA in December 2018, a federal inmate is now permitted to file a motion for compassionate release directly with the court after exhaustion of

administrative remedies.  *See United States v. McCoy*, 981 F.3d 271, 275-76 (4th Cir. 2020). Specifically, pursuant to the 2018 FSA, the Court may reduce a defendant's term of imprisonment "upon motion of the Director of [BOP], *or upon motion of the defendant after the defendant has fully exhausted all administrative rights* to appeal a failure of the [BOP] to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility," whichever occurs first.  *Id.* (emphasis added).

Once a defendant has exhausted his administrative remedies, or after 30 days have passed from the date on which the warden has received the defendant's request, the defendant may petition a court directly for compassionate release.  *Ferguson*, 55 F.4th at 268; *Jenkins*, 22 F.4th at 169; *United States v. Muhammad*, 16 F.4th 126, 129 (4th Cir. 2021); *McCoy*, 981 F.3d at 276.  This constituted a sea change in the law.

But, under 18 U.S.C. § 3582(c)(1)(A), the court may modify the defendant's sentence only if two criteria are met.  *Bethea*, 54 F.4th at 831.  In other words, the analysis consists of "two steps."  *Bond*, 56 F.4th at 383.  And, for a court to award compassionate release, it must conclude that the movant satisfies both criteria.  *Bethea*, 54 F. 4th at 831; *see Hargrove*, 30 F.4th at 194-95.

"First, the court must determine the prisoner is eligible for a sentence reduction because he has shown 'extraordinary and compelling reasons' supporting relief."  *Bethea*, 54 F.4th at 831 (citation omitted); *see also Bond*, 56 F.4th at 383; *United States v. Kibble*, 992 F.3d 326, 330 (4th Cir. 2021) (per curiam), *cert. denied*, ___ U.S. ___, 142 S. Ct. 383 (2021).  If that criteria is met, the court "must then find that release is appropriate under the 18 U.S.C. § 3553(a) sentencing factors, to the extent those factors are applicable."  *Bethea*, 54 F.4th at 831; *see also Malone*, 57 F.4th at 174; *Hargrove*, 30 F.4th at 194; *United States v. High*, 997 F.3d 181, 186 (4th Cir. 2021); *Kibble*, 992 F.3d at 330.

Generally, "the district court enjoys broad discretion in conducting a § 3582(c)(1)(A) analysis." *Jenkins*, 22 F.4th at 169.  But, the Fourth Circuit has said: "When deciding whether to reduce a defendant's sentence under § 3582(c)(1)(A), a district court may grant a reduction only if it is 'consistent with applicable policy statements issued by the Sentencing Commission.'" *United States v. Taylor*, 820 F. App'x 229, 230 (4th Cir. 2020) (per curiam) (citing 18 U.S.C. § 3582(c)(1)(A)).

In U.S.S.G. § 1B1.13, titled "Reduction in Term of Imprisonment under 18 U.S.C. § 3582(c)(1)(A) Policy Statement," the Sentencing Commission addressed the "extraordinary and compelling reasons" that might merit compassionate release.  *See McCoy,* 981 F.3d at 276-77.[2]  In particular, U.S.S.G. § 1B1.13 provides that on motion by the Director of the BOP, the court may reduce a sentence where warranted by extraordinary or compelling reasons (§ 1B1.13(1)(A)); the defendant is at least 70 years old and has served at least 30 years in prison (§ 1B1.13(1)(B)); the defendant is not a danger to the safety of any other person or to the community (§ 1B1.13(2)); and the reduction is consistent with the policy statement. U.S.S.G. § 1B1.13(3).

The Application Notes to U.S.S.G. § 1B1.13 are expansive and indicate that compassionate release may be based on circumstances involving illness, declining health, age, exceptional family circumstances, as well as "other reasons." U.S.S.G. § 1B1.13 App. Notes 1(A)-(D). Application Note 1(D), titled "Other Reasons," permits the court to reduce a sentence where, "[a]s determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)."  U.S.S.G. § 1B1.13 App. Note 1(D).  This is the "so-called, 'catch-

---

[2] The Sentencing Commission acted pursuant to 28 U.S.C. § 994(t) (directing Sentencing Commission to "describe what should be extraordinary and compelling reasons for sentence reduction"), as well as 28 U.S.C. § 994(a)(2)(C).  *See McCoy,* 981 F.3d at 276.

all' category." *McCoy*, 981 F.3d at 276.

However, as the Fourth Circuit has recognized, there is no applicable policy statement for a motion filed by a defendant under § 3582(c)(1)(A). *See, e.g.*, *Malone*, 57 F.4th at 174; *McCoy*, 981 F.3d at 276. Of significance here, the policy statement in U.S.S.G. § 1B1.13 was issued in 2006 and was last updated in November 2018, *prior* to the enactment of the FSA. It is *only* "directed at BOP requests for sentence reductions." *McCoy*, 981 F.3d at 276 (citing U.S.S.G. § 1B1.13). Thus, "[b]y its plain terms. . . § 1B1.13 does not apply to defendant-filed motions under § 3582(c)(1)(A)." *McCoy*, 981 F.3d at 282; *see also Jenkins*, 22 F.4th at 169; *United States v. Brooker,* 976 F.3d 228, 235-36 (2nd Cir. 2020); *United States v. Jones*, 980 F.3d 1098, 1100-02 (6th Cir. 2020); *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

Notably, "Section 3582(c)(1)(A)(i) does not attempt to define the 'extraordinary and compelling reasons' that might merit compassionate release." *McCoy*, 981 F.3d at 276. And, because there is currently no Sentencing Commission policy statement applicable to a defendant's compassionate release motion, "district courts need not conform, under § 3582(c)(1)(A)'s consistency requirement, to [U.S.S.G.] § 1B1.13 in determining whether there exist 'extraordinary and compelling reasons' for a sentence reduction." *McCoy*, 981 F.3d at 283; *see also Hargrove*, 30 F.4th at 194-95; *United States v. Brice*, 2022 WL 3715086, at *1 (4th Cir. Aug. 29, 2022) (per curiam). Although there are currently no applicable policy statements for the Sentencing Commission that are applicable to compassionate release., U.S.S.G. § 1B1.13 "remains helpful guidance . . . ." *McCoy*, 981 F.3d at 282 n.7; *see Hargrove*, 30 F.4th at 194. Consequently, district courts are "'empowered . . . to consider any extraordinary and compelling reason for release that a defendant might raise.'" *McCoy*, 981 F.3d at 284 (citation omitted); *see also Jenkins*, 22 F.4th at 170.

"The factors applicable to the determination of what circumstances can constitute an extraordinary and compelling reason for release from prison are complex and not easily summarized." *Hargrove*, 30 F.4th at 197.  But, "successful rehabilitation efforts can be considered" in regard to the analysis of extraordinary and compelling reasons. *United States v. Harris*, 2022 WL 636627, at *1 (4th Cir. Mar. 4, 2022) (per curiam); *see United States v. Gutierrez*, ___ Fed. App'x ___, 2023 WL 245001, at *4 (4th Cir. Jan. 18, 2023) (stating that, in considering motion for compassionate release, district court erred by failing to address defendant's evidence of rehabilitation).  Nevertheless, "rehabilitation alone cannot serve as a basis for compassionate release." *United States v. Davis*, 2022 WL 127900, at *1 (4th Cir. Jan. 13, 2022) (per curiam); *see McCoy*, 981 F.3d at 286 n.9; *Harris*, 2022 WL 636627, at *1; 28 U.S.C. § 994(t).  Moreover, "[i]n deciding a motion for compassionate release, the district court is confined to the evidence presented." *Bethea*, 54 F.4th at 833 n.2; *see also United States v. Osman*, 2022 WL 485183, at *1 (4th Cir. Feb. 17, 2022).

The Guidelines "are not directly applicable to defendant-filed motions" under § 3582(c). *Jenkins*, 22 F.4th at 169.  However, "the court may consider these guidelines in defining what should be considered an 'extraordinary and compelling circumstance' warranting a sentence reduction." *Id.* (citing U.S.S.G. § 1B1.13); *see High*, 997 F.3d at 187.

Of relevance here, the Supreme Court decided *Concepcion v. United States*, ___ U.S. ___, 142 S. Ct. 2389 (2022), on June 27, 2022.  In that case, the Supreme Court said, in the context of § 404(b) of the First Step Act, that "a district court cannot . . . recalculate a movant's benchmark Guidelines range in any way other than to reflect the retroactive application of the Fair Sentencing Act [of 2010] . . . ." *Id.* at 2402 n.6.  The Court explained that the "Guidelines range 'anchor[s]' the sentencing proceeding . . . .  The district court may then consider postsentencing conduct or

11

nonretroactive changes . . . with the properly calculated Guidelines range as the benchmark." *Id.* (first alteration in original; internal citation omitted); *see also United States v. Troy*, 64 F.4th 177, 183-84 (4th Cir. 2023).

To be sure, the district court is obligated to consider all non-frivolous arguments for sentence reduction based on intervening changes in the law and factual developments. *Concepcion*, 142 S. Ct. at 2396; *Troy,* 64 F.4th at 184; *United States v. Reed*, 58 F.4th 816, 822 (4th Cir. 2023); *Brice*, 2022 WL 3715086, at *2. However, such changes do not warrant a recalculation of the Guidelines. *Troy*, 64 F.4th at 184.

As the movant, the defendant bears the burden of establishing that he is entitled to a sentence reduction under 18 U.S.C. § 3582. *See*, *e.g.*, *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Edwards*, 451 F. Supp. 3d 562, 565 (W.D. Va. 2020). And, compassionate release is a "rare" remedy. *White v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019); *see Chambliss*, 948 F.3d at 693-94; *United States v. Mangarella*, FDW-06-151, 2020 WL 1291835, at *2-3 (W.D. N.C. Mar. 16, 2020).

As explained, even if the defendant establishes an extraordinary and compelling reason that renders him eligible for a sentence reduction, that does not end the inquiry. The second step requires the court to consider the factors under 18 U.S.C. § 3553(a) to determine whether, in its discretion, a reduction of sentence is appropriate. *See Dillon v. United States*, 560 U.S. 817, 826-27 (2010); *United States v. Mangarella*, 57 F.4th 197, 200, 203 (4th Cir. 2023); *Malone*, 57 F.4th at 174; *Bethea*, 54 F.4th at 833; *Hargrove*, 30 F.4th at 195; *High*, 997 F.3d at 186; *Martin*, 916 F.3d 397; *see also United States v. Jones*, 2022 WL 2303960, at *1 (4th Cir. June 27, 2022) (per curiam) (noting that "a court need not explicitly make findings on extraordinary and compelling reasons where consideration of the § 3553(a) factors counsels against release"); *United States v.*

12

*Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam) (noting that, even if the district court finds extraordinary and compelling circumstances, it must consider the § 3553(a) factors to the extent applicable in exercising its discretion); *Kibble*, 992 F.3d at 329-30 (noting that district court must consider § 3553(a) factors when considering a motion to reduce sentence under § 3582(c)(1)(A) and district court enjoys broad discretion in conducting this analysis); *United States v. Trotman*, 829 F. App'x 607, 608 (4th Cir. 2020) (per curiam) (recognizing that, when considering a motion to reduce sentence under § 3582(c)(1)(A), the court must consider the sentencing factors under § 3553(a), to the extent applicable); *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020) (district court must give due consideration to the § 3553(a) factors).

As the Fourth Circuit has observed "'many case-specific facts fit under the broad umbrella of the Section 3553(a) factors.'" *Bond*, 56 F.4th at 384 (quoting *United States v. Jackson*, 952 F.3d 492, 500 (4th Cir. 2020)).  And, in weighing the § 3553(a) factors, the court may consider the terms of a plea bargain.  *Bond*, 56 F.4th at 384-85.

Of relevance here, "[a] district court need not provide an exhaustive explanation analyzing every § 3553(a) factor," nor is it "required to address each of a defendant's arguments when it considers a motion for compassionate release."  *Jenkins*, 22 F.4th at 170; *see Chavez-Mena v. United States*, ___ U.S. ___, 138 S. Ct. 1959 (2018); *High*, 997 F.3d at 187.  But, a district court abuses its discretion when it "act[s] arbitrarily or irrationally," "fail[s] to consider judicially recognized factors constraining its exercise of discretion," "relie[s] on erroneous factual or legal premises," or "commit[s] an error of law."  *High*, 997 F.3d at 187 (internal quotation marks omitted); *see Jenkins*, 22 F.4th at 167.  And, "'the record as a whole'" must demonstrate that the judge considered the parties' contention, and had "'a reasoned basis'" for the exercise of his or her

discretion.  *Malone*, 57 F.4th at 176 (citations omitted); *see also United States v. Puzey*, 2023 WL 2985127, at *2 (4th Cir. Apr. 18, 2023) (per curiam).

Moreover, where appropriate, the district court "must account not only for the circumstances at the time of the original offense but also for significant post-sentencing developments." *Mangarella*, 57 F.4th at 203; *see Martin*, 916 F.3d at 397; *Kibble*, 992 F.3d at 334 n. 3.  That said, "[h]ow much explanation is 'enough' depends on the complexity of a given case." *Gutierrez*, 2023 WL 245001, at *3; *see United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021).

Notably, "it weighs against an abuse of discretion—and is viewed as 'significant'—when the same judge who sentenced the defendant rules on the compassionate release motion." *Bethea*, 54 F.4th at 834; *see Gutierrez*, 2023 WL 245001, at *5; *Hargrove*, 30 F.4th at 200; *High*, 997 F.3d at 189.  Moreover, "the district court is less likely to have abused its discretion if it considered arguments in opposition to its ultimate decision." *Bethea*, 54 F.4th at 834; *see also High*, 997 F.3d at 189; *Kibble*, 992 F.3d at 332.

In any event, "the court must provide an explanation sufficient 'to allow for meaningful appellate review' in light of the particular circumstances of the case." *United States v. Cohen*, 2022 WL 2314300, at *1 (4th Cir. June 28, 2022) (per curiam) (quoting *High*, 997 F.3d at 190).  And, "when a defendant 'present[s] a significant amount of post-sentencing mitigation evidence, . . . a more robust and detailed explanation [is] required.'" *Cohen*, 2022 WL 2314302, at *1 (quoting *High*, 997 F.3d at 190) (alterations in *Cohen*).  In doing so, "a district court is permitted to add to its original, sentencing-phase consideration of the § 3553(a) factors when explaining its compassionate release ruling." *Bethea*, 54 F.4th at 834; *see Kibble*, 992 F.3d at 332.

14

### III. COVID-19[3]

### A.

The World Health Organization declared COVID-19 a global pandemic on March 11, 2020.  *See Seth v. McDonough*, 461 F. Supp. 3d 242, 247 (D. Md. 2020).[4]  Two days later, on March 13, 2020, President Trump declared a national emergency concerning the COVID-19 pandemic.  *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19),* Trump White House (Mar. 13, 2020), https://trumpwhitehouse.archives.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/.  That declaration was extended on several occasions.  *See*, *e.g.*, 88 Fed. Reg. 9385 (Feb. 10, 2023).

COVID-19 spawned "a public health crisis more severe than any seen for a hundred years." *Antietam Battlefield KOA v. Hogan*, CCB-20-1130, 461 F. Supp. 3d 214, 223 (D. Md. 2020), *aff'd in part, dismissed in part*, 2022 WL 1449180 (4th Cir. May 9, 2022) (per curiam).  People who are stricken with the coronavirus sometimes experience only mild or moderate symptoms.  But, particularly at the outset of the pandemic, the virus could cause severe medical problems as well as death, especially for those in "high-risk categories . . . ."  *Antietam Battlefield KOA*, 461 F. Supp. 3d at 223 (citation omitted).

On May 11, 2022, the United States "reached more than 1 million COVID-19 deaths, according to a Reuters tally, crossing a once-unthinkable milestone about two years after the first

---

[3] The Court may take judicial notice of matters of public record.  *See* Fed. R. Evid. 201.

[4] Severe Acute Respiratory Syndrome Coronavirus 2 (SARS-CoV-2) is the cause of coronavirus disease 2019, commonly called COVID-19.  *See Naming the Coronavirus Disease and the Virus that Causes It*, World Health Org., https://bit.ly/2UMC6uW  (last accessed June 15, 2020).

cases upended everyday life."  Trevor Hunnicutt & Jeff Mason, *Biden marks one million U.S. COVID deaths after losing political battles*, REUTERS (May 12, 2022), https://www.reuters.com/world/us/biden-marks-1-million-americans-dead-covid-2022-05-12/. And, as of March 10, 2023, this number rose to 1,123,836.  *See COVID-19 Dashboard*, THE JOHNS HOPKINS UNIV., https://bit.ly/2WD4XU9 (last accessed May 3, 2023).

Johns Hopkins University ceased the collection of COVID-19 data as of March 10, 2023. But, it reports that, as of that date, COVID-19 had infected more than 103.8 million Americans. *Id*.

The judges of this Court "have written extensively about the pandemic."  *United States v. Williams*, PWG-19-134, 2020 WL 3073320, at *1 (D. Md. June 10, 2020) (collecting cases). Therefore, it is not necessary to recount in detail the "unprecedented nature and impact" of the pandemic.  *Id.*  That said, the Court must reiterate that the COVID-19 pandemic has been described as the worst public health crisis that the world has experienced since 1918.  *See United States v. Hernandez*, 451 F. Supp. 3d 301, 305 (S.D.N.Y. 2020) ("The COVID-19 pandemic . . . . presents a clear and present danger to free society for reasons that need no elaboration.").

For a significant period of time, life as we have known it came to a halt.  For quite some time, businesses and schools were shuttered or operated on a limited basis, in an effort to thwart the spread of the virus, which is highly contagious.  *See Coronavirus Disease 2019 (COVID-19), How COVID-19 Spreads*, CTRS. FOR DISEASE CONTROL & PREVENTION (Aug. 11, 2022), https://bit.ly/2XoiDDh.  The judiciary, too, faced many operational challenges.  Indeed, the pandemic "produced unparalleled and exceptional circumstances affecting every aspect of life as we have known it."  *Cameron v. Bouchard*, LVP-20-10949, 2020 WL 2569868, at *1 (E.D. Mich. May 21, 2020), *vacated on other grounds*, 815 F. App'x 978 (6th Cir. 2020).

Of relevance here, the Centers for Disease Control and Prevention ("CDC") has identified certain risk factors that may increase the chance of severe illness due to the coronavirus, and the CDC has repeatedly revised its guidance as to medical conditions that pose a greater risk of severe illness due to COVID-19.  In February 2023, the CDC updated its guidance to reflect the most available data.  *See People with Certain Medical Conditions*, CTRS. FOR DISEASE CONTROL & PREVENTION (February 10, 2023), https://bit.ly/38S4NfY.

According to the CDC, the factors that increase the risk of severe illness include cancer; chronic kidney disease; chronic liver disease; chronic lung diseases, including COPD, asthma (moderate to severe), interstitial lung disease, cystic fibrosis, and pulmonary hypertension; dementia or other neurological conditions; diabetes (Type 1 and Type 2); disabilities, such as Down syndrome; heart conditions, such as heart failure, coronary artery disease, cardiomyopathies, and possibly hypertension; HIV; being immunocompromised; liver disease; obesity, where the BMI is 25 or higher; physical inactivity; pregnancy; sickle cell disease; smoking; solid organ or blood stem cell transplant; stroke or cerebrovascular disease; mental health conditions; substance use disorders; and tuberculosis.  *Id.*

The CDC has also indicated that the risk for severe illness from COVID-19 increases with age, with older adults at highest risk.  *See COVID-19 Risks and Information for Older Adults*, CTRS. FOR DISEASE CONTROL & PREVENTION (Feb. 22, 2023), https://www.cdc.gov/aging/covid19/index.html.  Furthermore, "[t]he risk of severe illness from COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*, https://bit.ly/38S4NfY.

As to the CDC's risk factors, in the context of a motion for compassionate release, the Fourth Circuit has said that "use of a bright-line rule that accepts only the CDC's highest risk

conditions is too restrictive." *Hargrove*, 30 F.4th at 195.  In other words, there is no bright-line rule predicated only on the CDC's identification of certain health conditions in the "highest risk category." *Id.* at 196.  Nevertheless, the court may consider the CDC's guidelines.  *Bethea*, 54 F.4th at 832; *United States v. Petway*, 2022 WL 168577, at *3 (4th Cir. Jan. 19, 2022) (per curiam). And, "the inquiry should consider whether the underlying condition places the inmate at an increased risk of severe illness from Covid-19."  *Bethea*, 54 F.4th at 832.

### B.

At the outset of the pandemic, in an effort to stem the spread of the virus, people were urged to practice "social distancing" and to wear masks.  *See Coronavirus Disease 2019 (COVID-19), How to Protect Yourself & Others*, CENTERS FOR DISEASE CONTROL & PREVENTION (Jan. 26, 2023), https://bit.ly/3dPA8Ba (last accessed May 3, 2023).  However, social distancing is particularly difficult in the penal setting.  *Seth*, 2020 WL 2571168, at *2; *Senate Judiciary Hrg. Transcript on Incarceration during COVID-19*, REV.COM (June 2, 2020) (Testimony of BOP Dir. Michael Carvajal at 47:00) ("Prisons by design are not made for social distancing. They are on [sic] the opposite made to contain people in one area.").  Indeed, prisoners have little ability to isolate themselves from the threat posed by the coronavirus.  *Id.*; *see Cameron*, 2020 WL 2569868, at *1; *see also United States v. Mel*, TDC-18-0571, 2020 WL 2041674, at *3 (D. Md. Apr. 28, 2020) ("In light of the shared facilities, the difficulty of social distancing, and challenges relating to maintaining sanitation, the risk of infection and the spread of infection within prisons and detention facilities is particularly high.").  Prisoners usually "share bathrooms, laundry and eating areas," and are often "bunked in the same cell" with several others.  Amanda Klonsky, *An Epicenter of the Pandemic Will Be Jails and Prisons, if Inaction Continues*, N.Y. TIMES (Mar. 16, 2020).  And, they are not free to follow their own rules.

18

To illustrate, prisoners are not readily able to secure safety products on their own to protect themselves, such as masks and hand sanitizers, nor are they necessarily able to separate or distance themselves from others. *See* Kim Bellware, *Prisoners and Guards Agree About Federal Coronavirus Response: 'We do Not Feel Safe*,' WASH. POST (Aug. 24, 2020) (reporting use of non-reusable masks for months and a lack of transparency around policies for personal protective equipment and testing). They do not get to decide where, when, or how to eat or sleep. Consequently, correctional facilities are especially vulnerable to viral outbreaks and ill-suited to stem their spread. *See Coreas v. Bounds*, TDC-20-0780, 2020 WL 1663133, at *2 (D. Md. Apr. 3, 2020) ("Prisons, jails, and detention centers are especially vulnerable to outbreaks of COVID-19."); *see also* Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 16, 2021) (stating that the "cramped, often unsanitary settings of correctional institutions have been ideal for incubating and transmitting the disease. Social distancing is often not an option."); Letter of 3/25/20 to Governor Hogan from approximately 15 members of Johns Hopkins faculty at the Bloomberg School of Public Health, School of Nursing, and School of Medicine (explaining that the "close quarters of jails and prisons, the inability to employ effective social distancing measures, and the many high-contact surfaces within facilities, make transmission of COVID-19 more likely"); *accord Brown v. Plata*, 563 U.S. 493, 519-20 (2011) (referencing a medical expert's description of the overcrowded California prison system as "'breeding grounds for disease'") (citation omitted).

On March 23, 2020, the CDC issued guidance for the operation of penal institutions to help prevent the spread of the virus. *Seth*, 2020 WL 2571168, at *2. Notably, the BOP implemented substantial measures to mitigate the risks to prisoners, to protect inmates from COVID-19, and to treat those who are infected. As the Third Circuit recognized in *United States v. Raia*, 954 F.3d

594, 597 (3d Cir. 2020), the BOP made "extensive and professional efforts to curtail the virus's spread."[5]

The Department of Justice ("DOJ") recognized the unique risks from COVID-19 experienced by inmates and employees of the BOP.  The DOJ adopted the position that an inmate who presents with one of the risk factors identified by the CDC should be considered as having an "extraordinary and compelling reason" warranting a sentence reduction.  *See* U.S.S.G. § 1B1.13 cmt. n.1(A)(ii)(I).

On March 26, 2020, then Attorney General William Barr issued a memorandum to Michael Carvajal, Director of the BOP, instructing him to prioritize the use of home confinement for inmates at risk of complications from COVID-19.  *See Hallinan v. Scarantino*, 20-HC-2088-FL, 2020 WL 3105094, at *8 (E.D. N.C. June 11, 2020).  And, on March 27, 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281.  In relevant part, the CARES Act authorized the Director of BOP to extend the permissible length of home confinement, subject to a finding of an emergency by the Attorney

---

[5] In June 2020, the *New York Times* reported that cases of COVID-19 had "soared in recent weeks" at jails and prisons across the country.  Timothy Williams et al., *Coronavirus cases Rise Sharply in Prisons Even as They Plateau Nationwide*, N.Y. TIMES (June 18, 2020), https://nyti.ms/37JZgH2; On October 29, 2020, the *New York Times* reported that "[i]n American jails and prisons, more than 252,000 people have been infected and at least 1,450 inmates and correctional officers have died" from COVID-19. *See Cases in Jails and Prisons*, N.Y. TIMES (Oct. 29, 2020). On November 21, 2020, the *New York Times* reported that "U.S. correctional facilities are experiencing record spikes in coronavirus infections this fall. During the week of Nov. 17, there were 13,657 new coronavirus infections reported across the state and federal prison systems*." America Is Letting the Coronavirus Rage Through Prisons*, N.Y. TIMES (Nov. 21, 2020), https://www.nytimes.com/2020/11/21/opinion/sunday/coronavirus-prisons-jails.html.

On April 16, 2021, the *New York Times* reported that at least 39% of prisoners are known to have been infected in federal facilities. Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. TIMES (Apr. 10, 2021). And, according to the article, the actual count is most likely much higher "because of the dearth of testing." *Id.* Nevertheless, with the passage of time, the outbreaks of COVID-19 have declined.

General.  *See* Pub. L. No. 116-136, § 12003(b)(2).  On April 3, 2020, then Attorney General Barr issued another memorandum to Carvajal, finding "the requisite emergency . . . ."  *Hallinan*, 2020 WL 3105094, at *9.  That memorandum "had the effect of expanding the [BOP's] authority to grant home confinement to any inmate . . . ."  *Id.*

Two BOP officials, Andre Matevousian, then Acting Assistant Director of the Correctional Programs Division, and Hugh Hurwitz, then Assistant Director of the Reentry Services Division, issued a memorandum on May 8, 2020, to implement the Attorney General's directives on the increased use of home confinement.  The memorandum provided that the BOP was prioritizing the review of inmates for home confinement, as to inmates who have either served a certain portion of their sentence or who only have a short amount of time remaining on their sentence.

## C.

Unfortunately, there is no cure for the coronavirus.  But, medical treatments have continued to improve.  And, significantly, we have seen the rollout of four vaccines for COVID-19 (Pfizer, Moderna, Johnson & Johnson, and Novavax).  *See* Rebecca Robbins and Carl Zimmer, *A fourth COVID vaccine is cleared for use in the United States.*, N.Y. Times (July 20, 2022), https://www.nytimes.com/2022/07/19/health/cdc-novavax-covid-vaccine.html.   Initially, the vaccines were made available to health care workers, the elderly in nursing homes, and first responders.  But, the criteria for eligibility has since been approved for all persons six months of age and older.  *See* Rhitu Chatterjee, *CDC clears the way for vaccinations for children 6 months to 5 years old*, NPR (June 18, 2022), https://www.npr.org/sections/health-shots/2022/06/18/1105929247/vaccinations-for-children-6-months-to-5-years-old-can-begin-after-cdc-clears-the.

On March 29, 2022, federal regulators approved a second and third booster dose for individuals age 50 and older as well as those at higher risk. *See* Cheyenne Haslett and Eric M. Strauss, *Officials say everyone over 50 can get a 4th COVID shot, but 'especially important' for higher risk people*, ABC NEWS (Mar. 29, 2022), https://abcnews.go.com/Health/4th-covid-shot-authorized-fda-50/story?id=83730999.   Additionally, on September 1, 2022, the CDC recommended updated COVID-19 boosters from Pfizer-BioNTech for people ages 12 years and older and from Moderna for people ages 18 years and older. *CDC Recommends the First Updated COVID-19 Booster*, CTRS. FOR DISEASE CONTROL (Sept. 1, 2022), https://www.cdc.gov/media/releases/2022/s0901-covid-19-booster.html

On January 4, 2021, at about the time of the initial vaccine rollout, the BOP published "COVID-19 Vaccine Guidance." *See COVID-19 Vaccine Guidance*, FEDERAL BUREAU OF PRISONS CLINICAL GUIDANCE (Jan. 4, 2021), https://www.bop.gov/resources/pdfs/2021_covid19_vaccine.pdf. It provided that administration of the COVID-19 vaccine (Pfizer and Moderna) would "align with [recommendations of] the Centers for Disease Control and Prevention." *Id.* at 4. Its plan was for prisoners at heightened risk to receive priority for the vaccine. *Id.* at 6. The BOP reportedly received its first shipment of vaccines on December 16, 2020. Walter Pavlo, *Federal Bureau of Prisons Starts Vaccination of Staff, Inmates Soon Thereafter*, FORBES (Dec. 21, 2020), https://www.forbes.com/sites/walterpavlo/2020/12/21/federal-bureau-of-prisons-starts-vaccination-of-staff-inmates-soon-thereafter/?sh=5683b99aa96f. Much has changed since that time.

As of May 3, 2023, the BOP had 145,388 federal inmates and approximately 36,000 staff. And, by that date, the BOP had administered 350,096 vaccine doses to staff and inmates. *See* Bureau of Prisons, https://www.bop.gov/coronavirus/ (last updated May 3, 2023).

Also, as of April 2023, approximately 69% of the total U.S. population has completed their primary vaccination series (i.e., one dose of a single-dose vaccine or two doses on different days), including 32% of people from ages 5 to 11, 61% of people from ages 12 to 17, 66% of people from ages 18 to 24, 72% of people from ages 25 to 49, 83% of people from ages 50 to 54, and 94% of people ages 65 and up. *See COVID-19 Vaccinations in the United States*, Ctrs. for Disease Control, https://covid.cdc.gov/covid-data-tracker/#vaccinations_vacc-people-fully-percent-pop5 (last updated Apr. 26, 2023); *Trends in Demographic Characteristics of People Receiving COVID-19 Vaccinations in the United States*, Ctrs. for Disease Control, https://covid.cdc.gov/covid-data-tracker/#vaccination-demographics-trends (last updated Apr. 26, 2023);  Moreover, approximately 54.5 million Americans have received a third or "booster" vaccine dose, which the CDC recommends for all persons age 5 and older. *See id.*; *COVID-19 Vaccine Booster Shots*, Ctrs. for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/vaccines/booster-shot.html (last updated May 2, 2023).

## D.

The number of COVID-19 cases continues to fluctuate.  For a brief time in the Fall of 2021, the country enjoyed a reduction of COVID-19 cases. *See* David Leonhardt, *Covid Cases Keep Falling*, N.Y. Times, Oct. 27, 2021, https://www.nytimes.com/2021/10/26/briefing/covid-cases-falling-delta.html ("The number of new daily COVID-19 cases has plunged since peaking on Sept.1. Almost as encouraging as the magnitude of the decline is its breadth: Cases have been

declining in every region.").  But, the trend was short-lived, due to the spread of the Delta variant and then the Omicron variant.

The Delta variant was thought to be more virulent than earlier strains of COVID-19.  *See Delta Variant: What We Know About the Science*, CTRS. FOR DISEASE CONTROL AND PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/delta-variant.html (updated Aug. 6, 2021) (noting that the Delta variant is "more than [two times] as contagious as previous variants");  *see also* Jon Kamp & Brianna Abbott, *Delta Variant Recedes Across the United States*, WALL ST. J., Nov. 1, 2021, https://www.wsj.com/articles/delta-surge-of-covid-19-recedes-leaving-winter-challenge-ahead-11635672600 ("The Delta-fueled wave continues to take a serious toll, but the seven day average in reported deaths has dropped to about 1,400 a day from daily averages above 2,000 in late September, Johns Hopkins data show."); Apoorva Mandavilli, *What to Know About Breakthrough Infections and the Delta Variant*, N.Y. TIMES (Aug. 14, 2021), https://www.nytimes.com/article/covid-breakthrough-delta-variant.html (noting that, as of August 14, 2021, "[i]nfections have spiked to the highest levels in six months").

After the Delta variant, the Omicron variant emerged, sparking concern because it was highly contagious.  *See Omicron Variant: What You Need to Know*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://www.cdc.gov/coronavirus/2019-ncov/variants/omicron-variant.html (last updated Dec. 13, 2021).  Indeed, Omicron contributed to a substantial and serious spike in COVID-19 cases.  *See, e.g.*, Aya Elamroussi, *"Omicron surge is 'unlike anything we've ever seen,' expert says,"* CNN (Dec. 31, 2021), https://www.cnn.com/2021/12/30/health/us-coronavirus-thursday/index.html.  But, the number of COVID-19 cases again declined.  *See, e.g.*, Anabelle Timsit, *U.S. coronavirus cases are dropping. Other countries are breaking records.*, WASH. POST (Feb. 7, 2022), https://www.washingtonpost.com/nation/2022/02/07/covid-omicron-variant-live-

updates/#link-ZMG6VYX45VH5RAD3JX3IN3JF3Y.   And, the country began to return to normalcy.

Unfortunately, we then experienced another surge in COVID-19 cases.  *See, e.g.*, Anne Barnard, *Covid Cases Are Rising Again. How Cautious Should We Be?*, N.Y. TIMES (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/nyregion/covid-cases-are-rising-again-how-cautious-should-we-be.html.  In particular, in the spring of 2022 a new variant of the virus began "spreading rapidly" and soon became "the dominant form of the virus . . . ."   *See* Isabella Grullón Paz, *A new subvariant is spreading rapidly in the United States*, N.Y. TIMES (May 9, 2022), https://www.nytimes.com/live/2022/05/04/world/covid-19-mandates-vaccine-cases.   As of July 2022, the BA.5 variant of COVID-19, an "offshoot of the Omicron variant," was "spreading quickly," buttressed by an increased ability to overcome "some of the immune defenses acquired by vaccinated people, or those infected by earlier variants."  Ed Yong, *Is BA.5 the 'Reinfection Wave'?*, THE ATLANTIC (July 11, 2022), https://www.theatlantic.com/health/archive/2022/07/ba5-omicron-variant-covid-surge-immunity-reinfection/670485/.   But, the variant then seemed to subside.  *See COVID Data Tracker: Variant Proportions*, CTRS. FOR DISEASE CONTROL & PREVENTION, https://covid.cdc.gov/covid-data-tracker/#variant-proportions (last updated Apr. 28, 2023).

At this point, COVID-19 has, in a sense, become a fact of life.  *See* Mitch Smith and Julie Bosman, *Covid Deaths Surge Across a Weary America as a Once-Hopeful Summer Ends*, N.Y. TIMES, Sept. 5, 2021,  https://www.nytimes.com/2021/09/05/us/covid-surge-united-states.html ("[T]he coronavirus is going to remain a fact of American life for the foreseeable future.").  In other words, we are in "a more endemic phase of this crisis . . . ."  *See* District of Maryland Standing Order 2022-05, Misc. No. 00-308 (filed Dec. 14, 2022).  Indeed, in an interview in

September 2022 on the CBS television show "60 Minutes", President Biden claimed that the pandemic is "over" in the United States.  Alexander Tin, *Biden says Covid-19 pandemic is "over" in U.S.*, CBS NEWS (Sept. 19, 2022).  He stated: "The pandemic is over.  We still have a problem with COVID.  We're still doing a lotta work on it . . . .  But the pandemic is over." *Id*.  Indeed, as noted, Johns Hopkins University has ceased collecting COVID-19 data.  *See COVID-19 Dashboard, supra,* https://bit.ly/2WD4XU9.

Moreover, on February 10, 2023, President Biden provided notice of his intent to terminate the COVID-19 national emergency, which went into effect on May 11, 2023.  *Termination of COVID-19 National Emergency*, ADMINISTRATIVE OFFICE OF THE UNITED STATES COURTS (Apr. 3, 2023).  And, Congress also passed a joint resolution (H.J. Res. 7) declaring the end of the national emergency

In any event, it appears that "virus metrics have stabilized."  Standing Order 2022-05.  And, as Chief Judge Bredar of this Court has noted, in consultation with this court's epidemiologist, the virus patterns have changed, with the virus's severity decreasing as "the population has gained some level of immunity from vaccinations and prior infections."  *Id.*  Put another way, the coronavirus may be here to stay, but the acute nature of the crisis has certainly abated.

The BOP has reported that, as of May 4, 2023, 189 federal inmates, out of a total population of 145,391, and 31 BOP staff, out of some 36,000 staff members, currently test positive for COVID-19.  Moreover, 43,989 inmates and 15,275 staff have recovered from the COVID-19 virus.  In addition, 317 inmates and seven staff members have died from the virus.  The BOP has completed 128,641 COVID-19 tests.  *See* https://www.bop.gov/coronavirus/, *supra*.

With respect to Lewisburg USP, where the defendant is imprisoned, the BOP reported that as of May 4, 2023, out of a total of 1,077 inmates, one inmate and zero staff members currently

test positive, one inmates and zero staff members have died of COVID-19, and 277 inmates and 171 staff have recovered at the facility. In addition, 256 staff members and 1,222 inmates have been inoculated with the vaccine. *See* https://www.bop.gov/coronavirus/covid19_statistics.html; BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/lew/ (last accessed May 5, 2023).

## IV. Discussion

Drummond has moved for compassionate release on the ground that his medical conditions render him particularly vulnerable to COVID-19. ECF 1372 at 6-8. Specifically, he notes that he "suffers and struggles with" hypertension, obesity, sleep apnea, lung disease due to his smoking history, a history of hepatitis C, "mental and emotional distress," and severe back issues. *Id.* at 6.

Drummond's medical records indicate that he is 53 years old and suffers from essential (primary) hypertension and diabetes. *See* ECF 1397-2 at 66. Drummond's medical records also show that he was previously diagnosed with "Chronic viral hepatitis C." *Id.* at 67. However, Drummond's hepatitis C appears to have been treated and is currently listed as a "resolved" medical problem. *Id.* But, should defendant contract COVID-19, he is still at risk due to his hepatitis C. This is because corticosteroids are one of the most common treatments for COVID-19, and the use of such immunosuppressive drugs runs the risk of reactivating viral infections, such as hepatitis C. *See* S. Shokri & S. Mahmoudvand*, The possibility of hepatitis C reactivation in COVID-19 patients treated with corticosteroids*, 27, Annals of Hepatology, 4 (2022).

Moreover, Drummond's medical records for November 2022 clearly indicate he suffers from opioid use disorder and cannabis use disorder, both classified as "severe." ECF 1397-2 at 66. And, Drummond's medical records show that he has smoked ".25 pkgs [of cigarettes] per day x 30 years." *Id.* at 42.

27

Additionally, a person is considered obese if his BMI is 30 or higher. As of September 20, 2022, Drummond's height was listed as 68.5 inches and his weight was recorded as 264 pounds. ECF 1397-2 at 42. That equates to a BMI of 39.6.  *See Adult BMI Calculator*, Ctrs. for Disease Control and Prevention, https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html (last accessed May 9, 2023).

The CDC is clear that hypertension, diabetes, obesity, chronic liver diseases like hepatitis, substance use disorders, and being a current or former smoker can render an individual more likely to get very sick from COVID-19.  *People with Certain Medical Conditions*, *supra*.[6] The government proffered extensive medical records which indicate that Drummond is receiving treatment for his medical conditions. ECF 1397-2. The government proffered extensive medical records that indicate that Drummond is receiving treatment for his medical conditions. ECF 1397-2.Nevertheless, despite the government's contention that Drummond's medical issues are being treated, ECF 1397 at 21, those conditions place him at greater risk of severe illness from COVID-19.

Courts have found that obesity, or even borderline obesity, can serve as a basis for compassionate release, particularly when coupled with other chronic medical conditions.  *See United States v. Readus*, No. 16-20827-1, 2020 WL 2572280, at *3 (E.D. Mich. May 21, 2020) ("Courts have found that the combination of prediabetes and obesity have been sufficient to warrant release"); *see also, e.g.*, *United States v. Smith*, 538 F. Supp. 3d 990, 995 (E.D. Cal. 2021) ("Many courts have also found that people who have a body mass index within the ranges defined

---

[6] The other medical conditions that Drummond lists as grounds for compassionate release are not COVID-19 risk factors under the CDC guidelines. *See* ECF 1372 at 6.

as 'overweight' or 'obese' are at greater risk of severe COVID-19."); *Williams*, 2020 WL 3073320, at *1 (finding defendant with a BMI of 32.5 was obese and qualified for compassionate release given COVID-19); *United States v. Hilow*, No. 15-170-JD, 2020 WL 2851086, at *4 (D. N.H. June 2, 2020) (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Zuckerman*, 451 F. Supp. 3d 329, 335 (S.D.N.Y. 2020) (finding defendant's age, diabetes, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Ullings*, 1:10-CR-00406, 2020 WL 2394096, at *4 (N.D. Ga. May 12, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Foreman*, 3:19-CR-62 (VAB), 2020 WL 2315908, at *4 (D. Conn. May 11, 2020) (finding defendant's age, hypertension, and obesity satisfied an extraordinary and compelling reason); *United States v. Quintero*, 08-CR-6007L, 2020 WL 2175171, at *1 (W.D.N.Y. May 6, 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension satisfied an extraordinary and compelling reason); *United States v. Dawson*, No. 18-40085, 2020 WL 1812270, at *7 (D. Kan. Apr. 9, 2020) (granting compassionate release based on a defendant's obesity).

Moreover, as noted earlier, the "risk of severe COVID-19 increases as the number of underlying medical conditions increases in a person." *People with Certain Medical Conditions*, *supra*. Numerous judges have found extraordinary and compelling circumstances for defendants with multiple chronic medical conditions. *See, e.g.*, *United States v. Azianbidji*, PWG-17-253, 2021 WL 307416, at *1 (D. Md. Jan. 29, 2021) (defendant with hyperlipidemia, hypertension, and obesity); *United States v. White*, CCB-09-369, 2020 WL 3960830, at *2-3 (D. Md. July 10, 2020) (defendant with neutropenia, hyperlipidemia, hypertension, heart disease, chronic kidney disease, and obesity); *United States v. Oaks*, RDB-17-288, 2020 WL 3433326, at *3 (D. Md. June 23,

2020) (defendant with Type II diabetes, hypertension, asthma, anemia, hyperlipidemia, and arthritis); *Hilow*, 2020 WL 2851086, at *4 (involving asthma, migraines, hypertension, high cholesterol, prediabetes, and borderline obesity); *United States v. Gutman*, RDB-19-0069, 2020 WL 24674345, at *2 (D. Md. May 13, 2020) (finding defendant's age of 56 years, multiple sclerosis, and hypertension satisfied extraordinary and compelling reason); *United States v. Quintero*, 458 F. Supp. 3d 130, 132 (W.D.N.Y. 2020) (finding defendant's diabetes, compromised immune system, obesity, and hypertension constituted an extraordinary and compelling reason); *United States v. Coles*, No. 00-cr-20051, 2020 WL 1976296, at *7 (C.D. Ill. Apr. 24, 2020) (granting compassionate release to defendant with hypertension, prediabetes, prostate issues, bladder issues, and a dental infection); *United States v. Zukerman*, 451 F. Supp. 3d 329, 336 (S.D.N.Y. 2020) (concluding that defendant's diabetes, hypertension, obesity, and age satisfied extraordinary and compelling reason); *United States v. Rodriguez*, 451 F. Supp. 3d 392, 401 (E.D. Pa. 2020) (finding defendant's hypertension and diabetes qualified as extraordinary and compelling reason). There are also some cases in which courts have found extraordinary and compelling circumstances when hypertension is the sole condition. *See, e.g.*, *United States v. Salvagno*, 456 F. Supp. 3d 420, 423, 427-29 (N.D.N.Y. 2020); *United States v. Sawicz*, 453 F. Supp. 3d 601, 604-05 (E.D.N.Y. 2020).

Of import here, defendant has received four doses of the Pfizer-BioNTech COVID-19 vaccine. ECF 1397-2 at 69. The COVID-19 vaccines have been useful in reducing the health risks posed by the coronavirus. But, contrary to the government's assertion that vaccination "possibly eliminates entirely, the risk of severe disease from the virus," vaccines are not entirely effective, particularly as to the latest variants. ECF 1397 at 27. Indeed, "[t]he variants have shown a

remarkable ability to get around the protection offered by infection and vaccination."  Carla K. Johnson, *Experts decry little action as COVID-19 cases surge*, BALT. SUN (July 14, 2022).

In addition, as illustrated above, the future trajectory of the COVID-19 pandemic is anything but predictable.  As Judge Grimm said in *United States v. Palmer*, PWG-13-623, 2021 WL 3212586, at *3 (D. Md. July 29, 2021): "It is impossible to predict the impact of the vaccines on future strains of the virus, just as it is impossible to predict the impact of COVID-19 on [defendant's] specific medical issues."

The CDC has confirmed that breakthrough infections of COVID-19 occur even among vaccinated individuals and, albeit in rare cases, they can result in death.  *See Rates of COVID-19 Cases and Death by Vaccination Status*, CTRS. FOR DISEASE CONTROL & PREVENTION, Mar. 17, 2022, https://covid.cdc.gov/covid-data-tracker/#rates-by-vaccine-status (last accessed May 11, 2022).  An analysis of "nationwide data from the Center for Disease Control and Prevention" revealed that "[t]he vaccinated made up 42 percent of fatalities in January and February [of 2022,] during the highly contagious omicron variant's surge, compared with 23 percent of the dead in September, the peak of the delta wave."  Fenit Nirappil & Dan Keating, *Covid deaths no longer overwhelmingly among the unvaccinated as toll on elderly grows*, Wash. Post (Apr. 29, 2022), https://www.washingtonpost.com/health/2022/04/29/covid-deaths-unvaccinated-boosters/.

Therefore, the fact of defendant's vaccination does not eliminate concerns about his underlying health conditions that might otherwise render him eligible for compassionate release. Accordingly, that Drummond has been vaccinated against COVID-19 "does not negate that his underlying health conditions make him eligible for compassionate release."  *United States v. Spriggs*, CCB-10-0364, 2021 WL 1856667, at *3 (D. Md. May 10, 2021).

Several judges of this Court have concluded that an inmate is eligible for compassionate release, notwithstanding vaccination status. *See*, *e.g.*, *United States v. Hegie*, RDB-14-411, 2022 WL 605383, at *2 (D. Md. Mar. 1, 2022) (finding that, in light of the COVID-19 pandemic, a fully vaccinated defendant who suffered from obesity and asthma presented an extraordinary and compelling reason for his release); *United States v. Coleman*, PWG-17-393, WL 356724, at *3 (D. Md. Feb. 7, 2022) (determining that, in light of the dynamic nature of the COVID-19 pandemic and the absence of any information concerning the inmate's vaccination status, defendant's underlying medical conditions qualified as an extraordinary and compelling reason for his release); *United States v. Rivas*, TDC-19-0417, 2022 WL 36941, at *2 (D. Md. Jan. 4, 2022) (explaining that vaccinated defendant who was a paraplegic and suffered from frequent urinary tract infections could satisfy the extraordinary and compelling prong of the analysis).

"At the end of the day, district judges are not epidemiologists." *United States v. Sherrod*, 19-20139, 2021 WL 3473236, at *5 (E.D. Mich. Aug. 6, 2021).  In light of the evolving nature of COVID-19, coupled with defendant's various medical issues, I conclude that Drummond's vaccination status does not render him ineligible for compassionate release.  Moreover, I am satisfied that, based on defendant's medical conditions, he satisfies the "extraordinary and compelling" prong of the § 3582 analysis.  Even so, this does not end the inquiry.

The coronavirus is not "tantamount to a 'get out of jail free' card." *United States v. Williams*, PWG-13-544, 2020 WL 1434130, at *3 (D. Md. Mar. 24, 2020) (Day, M.J.).  Even when, as here, a court finds extraordinary and compelling reasons for compassionate release, relief is warranted under 18 U.S.C. § 3582(c)(1)(A) only if appropriate in light of the factors set forth in 18 U.S.C. § 3553(a).  *See Bethea*, 2022 WL 17588045, at *5; *High*, 997 F.3d at 186; *see also United States v. Butts*, 2021 WL 3929349, at *2 (4th Cir. Sept. 2, 2021) (per curiam).  These factors

include: (1) the nature of the offense and the defendant's characteristics; (2) the need for the sentence to reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (3) the kinds of sentences available and the applicable Guidelines range; (4) any pertinent Commission policy statements; (5) the need to avoid unwarranted sentence disparities; and (6) the need to provide restitution to victims. *High*, 997 F.3d at 186.

The government argues that defendant is a danger to the community. It points to the seriousness of defendant's offenses and his extensive criminal history. ECF 1397 at 29.

There is no doubt that defendant's criminal conduct was extremely serious, based on his role in an extensive drug conspiracy. But, Drummond's only recent prior conviction was for failure to stop at a stop sign in 2019. *Id.* ¶ 41. Further, "[p]rior to his injury in 2018, he maintained stable employment for almost 10 years and he previously earned his GED." *Id.* at 23. Moreover, the Court is mindful that from the time of the indictment in June 2019 to defendant's imprisonment in September 2022, Drummond was incarcerated for a period of only 6 days. And, he did well while on pretrial release for about two years. *See* ECF 1414 at 4; ECF 1175; ECF 95 (Order setting conditions of pre-trial release).

Indeed, I considered the factors favorable to Drummond in imposing Drummond's below-Guidelines sentence. ECF 1199 at 3. And, I also considered the effect of the COVID-19 pandemic.

Both Drummond and the government submitted sentencing memoranda. They urged the Court to utilize the Guideline range of 51 to 63 months' imprisonment, as anticipated in the Plea Agreement, rather than the Guidelines range found in the PSR. ECF 1180 at 3; ECF 1173 at 8; ECF 1175, ¶ 72. But, the government asked the Court to sentence defendant to 63 months' imprisonment, ECF 1180, whereas Drummond argued for a sentencing range below the range of 51 to 63 months' imprisonment. ECF 1173. Drummond's sentence of 48 months' imprisonment

reflects that I imposed a sentence consistent with the defendant's request. And, it was below the Guidelines anticipated in his Plea Agreement, even though those Guidelines were incorrect, in favor of defendant.

In considering the Motion, a defendant's post-sentencing conduct is relevant, because it "provides the most up-to-date picture" of the defendant's "'history and characteristics.'" *Pepper v. United States*, 562 U.S. 476, 492 (2011) (citing 18 U.S.C. § 3553(a)(1)). The court must "at least weigh the [defendant's] conduct in the years since the initial sentencing." *United States v. McDonald*, 986 F.3d 402, 412 (4th Cir. 2021); *see United States v. Martin*, 916 F.3d 389, 397 (4th Cir. 2019) (requiring an "individualized explanation" as to rehabilitative efforts). Drummond's rehabilitation is "a significant factor" in determining whether a sentence reduction is warranted. *United States v. Ogun*, ___F.Supp.3d___, 2023 WL 2207114, at *10 (E.D. Va. Feb. 24, 2023).

Defendant has only been incarcerated for a few months. To be sure, he has made efforts to rehabilitate himself. This includes enrolling in the "500 Hour Residential Drug Abuse Program" and participating in other BOP programs. ECF 1414 at 5. And, the government does not indicate that Drummond has been disciplined while incarcerated. But, rehabilitation alone does not warrant a defendant's immediate release. *Davis*, 2022 WL 127900, at *1.

Given the gravity of Drummond's underlying offense, the need to promote respect for the law, and the fact that defendant has only served approximately seventeen percent of his sentence, I decline to grant the Motion.

Drummond's Motion also contains what appears to be a request for home confinement. ECF 1372 at 1. But, any request for the conversion of a sentence of imprisonment to a sentence of home confinement must be submitted to the BOP, and not to this Court. Section 3624(c) of Title 18 of the United States Code is the only statute that authorizes the transfer of an inmate from prison

to home confinement. That section specifically provides that "[t]he authority under this subsection may be used to place a prisoner in home confinement for the shorter of ten percent of the term of imprisonment of that prisoner or six months." 18 U.S.C. § 3624(c)(2). However, this authority resides with the BOP, and not with the courts.

Section 12003(b)(2) of the CARES Act states that, during the COVID-19 emergency, "the director of the Bureau [of Prisons] may lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement." But, this provision does not alter the exclusive authority of the BOP to make this determination. *See United States v. Baker*, MR-10-69, 2020 WL 2430945, at *1 (W.D. N.C. May 12, 2020) (stating that authority to grant such relief rests solely with the Director of the Bureau of Prisons); *United States v. Gray*, FL-12-54, 2020 WL 1943476, at *3 (E.D. N.C. Apr. 22, 2020) (finding "defendant must seek home confinement through the BOP's administrative system"); *United States v. Johnson*, JKB-14-0356, 2020 WL 1929459, at *2 (Apr. 21, 2020) ("It is inherently the authority of the Bureau of Prisons to transfer an inmate to home confinement, pursuant to 18 U.S.C. § 3624(c)."). Therefore, this Court does not have the authority to place the defendant in home confinement. This request must be made through the BOP's administrative system.

### V. Conclusion

For the foregoing reasons, I shall deny the Motion (ECF 1372). An Order follows, consistent with this Memorandum Opinion.

Date: May 24, 2023

/s/
_____
Ellen Lipton Hollander
United States District Judge
